UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VINCENZO TRICOCI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 22 C 2060 |
| v. | ) |
| | ) Judge Sara L. Ellis |
| STEVEN VIDLJINOVIC, PATRICK BARKER, BRENDAN MCCRUDDEN, GEORGE GHORBANIAN, OSWALDO MALDONADO, ANDREW MARZEN, CHARLES LEACH, MICHAEL JACOB, EDWARD BAZAR, MICHAEL BURKE, and CITY OF CHICAGO, | ) ) ) ) ) ) ) ) |
| Defendants. | ) |

## OPINION AND ORDER

Plaintiff Vincenzo Tricoci sued Chicago Police Department ("CPD") Officers Steven Vidljinovic, Patrick Barker, Brendan McCrudden, George Ghorbanian, Oswaldo Maldonado, Andrew Marzen, Charles Leach, Michael Jacob, Edward Bazar, and Michael Burke (collectively, the "Defendant Officers"), claiming that they violated his Fourth Amendment rights by illegally searching his room in a shared living building, seizing a 9mm bullet, and subsequently arresting him without probable cause. Tricoci also claims that the Defendant Officers maliciously prosecuted him in violation of Illinois state law. Tricoci further sued the City of Chicago (the "City," and, collectively with the Defendant Officers, "Defendants") for indemnification (regarding his Fourth Amendment claims) and *respondeat superior* (regarding his state law claim). Defendants now move for summary judgment on all of Tricoci's claims, arguing that no disputes of fact exist that would allow a reasonable jury to find in Tricoci's favor with respect to his claims against the Defendant Officers or that the Defendant Officers are entitled to qualified

immunity, and that the City is correspondingly entitled to summary judgment for indemnification and *respondeat superior*. The Court finds that Tricoci may proceed on his false arrest and malicious prosecution claims against two of the Defendant Officers, McCrudden and Barker, and his corresponding indemnification and *respondeat superior* claims against the City. The Court grants summary judgment for Defendants on all other claims.

## BACKGROUND[1]

On April 23, 2021, the Defendant Officers accompanied members of the Troubled Buildings Unit, a joint unit within CPD and the Chicago Department of Buildings that investigates the habitability of buildings in disrepair, during an inspection of the three-story, multi-family residential property located at 1444 West Winona Street in Chicago, Illinois. Barker believed that a judge had signed a court order or warrant for the search, although Marlene Hopkins, the First Deputy Commissioner of the Department of Buildings, testified in an interview with the Civilian Office of Police Accountability that "it looks like maybe there wasn't an actual order made from court for the inspection, but the court inspection was, in fact, set for the 23rd of April at 9:30 a.m." Doc. 72-8 at 22:11–14. McCrudden testified that "the city inspectors had agreed with the property owner to do an inspection on that day." Doc. 72-7 at 39:25–40:1.

Tricoci, who has several felony convictions and was on court-ordered electronic monitoring on April 23, 2021, rented a room on the second floor of the building. Before the inspection, Tricoci knew that City officials would be inspecting the building. Although Tricoci did not necessarily expect police officers to be present for the inspection, he was not surprised

---

[1] The Court derives the facts in this section from Defendants' Statement of Undisputed Material Facts, Tricoci's response, and the exhibits attached thereto. The Court has included in this background section only facts that are appropriately presented, supported, and relevant to resolution of the pending motion for summary judgment. The Court takes all facts in the light most favorable to Tricoci, the non-movant.

when they entered the building. Tricoci testified that he had cleaned his room with his then-girlfriend before the inspection. Tricoci came down to the first floor kitchen during the search and did not attempt to prevent any of the Defendant Officers from entering his room.

According to the body camera footage, McCrudden went outside during the inspection to call someone at the Cook County Sheriff's Office to determine whether Tricoci's electronic monitoring equipment showed him at the property, commenting that they had not yet seen Tricoci there. He turned off his body camera during this conversation, turning it back on before he reentered the building. Once inside, McCrudden went to the basement and then made his way to the second floor by way of the back stairs. Sometime thereafter, Barker spoke with Tricoci in the first-floor kitchen, obtaining some basic identification information from him, before proceeding to the second floor,

Tricoci testified that he left his bedroom door wide open. But body camera footage shows that, while unlocked, the door was closed when McCrudden and other officers' arrived at the second floor. According to the body camera footage, McCrudden and Barker were the only two Defendant Officers to enter Tricoci's room. At 09:59:45 a.m., which corresponds to the 5:35 mark in the recording of McCrudden's body camera, McCrudden entered Tricoci's room. *See* Ex. 10 at 5:35. McCrudden remained in the room for approximately twenty seconds, shining his flashlight around the room, including into the closet. As he left the room, the footage recorded a distinct metallic sound. *See id.* at 5:52–54. Barker's body camera captured the moment that McCrudden steeped out of Tricoci's room at approximately 10:00:00 a.m., which corresponds to the 31:43 mark of the footage from Barker's camera. *See* Ex. 11 at 31:43. That footage shows McCrudden holding a flashlight in his right hand and his left hand empty by his side. *See id.* at 31:43–50. Barker informed McCrudden that Tricoci was on the first floor. They

3

sought multiple confirmations from other residents of the building that Tricoci lived in that room.

Approximately two minutes after McCrudden's first sweep of Tricoci's room, Barker entered the room, followed soon after by McCrudden. As Barker looked around the room, he found what appeared to be a rifle in the closet, which turned out to be a pellet gun. An inspector took some pictures of Tricoci's room, and then Barker asked if the inspector would mind if they closed the door to "make sure we don't have anything dangerous hanging behind here." Ex. 10 at 7:38–44; Ex. 11 at 33:33–38. Barker then looked behind the door and left the room. McCrudden proceeded to look between the door and the wall. He called Barker back over, shining his flashlight on what appeared to be a bullet lodged in the corner and stating, "that's a live round there," to which Barker responded, "yes it is." Ex. 10 at 8:04–17; Ex. 11 at 34:05–15. Barker picked up the object, and his body camera shows that it was or closely resembled a live round of ammunition. *See* Ex. 11 at 34:15–25.

After Barker recovered the bullet, McCrudden instructed Barker to have someone secure Tricoci in the kitchen. He then commented to Barker, "would you agree yes that's probable cause," to which Barker responded, "oh yeah, yeah." Ex. 10 at 8:33–37; Ex. 11 at 34:28–31. Barker handed the bullet to Bazar and instructed Bazar to get his partner and arrest Tricoci. McCrudden then proceeded into the kitchen and waited for Bazar to arrive. Bazar arrested Tricoci, and McCrudden informed Tricoci of his arrest for unlawful possession of ammunition by a felon in violation of 720 Ill. Comp. Stat. 5.0/24-1.1(a). Tricoci protested that he did not have any ammunition in his room, although he did admit he might have had a pellet or BB gun and that everything in his room belonged to him. Burke and Ghorbanian arrived to the scene after Tricoci's arrest, while Maldonado and Marzen arrived as the other Defendant Officers were

4

leaving the property. After other officers transported Tricoci to the police station but while the inspection of the property continued, McCrudden remarked to Barker that "I think now maybe we have enough to clear [Tricoci's] house arrest hopefully." Ex. 10 at 27:16–27; Ex. 11 at 53:1–20. Barker also described locking up Tricoci as a "bonus" of the inspection. Ex. 11 at 1:14:50–53.

An Assistant State's Attorney later brought felony charges against Tricoci based on McCrudden and Barker's recovery of the bullet. A judge in the Circuit Court of Cook County, First Municipal District held a preliminary hearing in Tricoci's case on May 5, 2021. Vidljinovic testified because, according to Barker, Barker was on the brink of retirement and would have been unavailable to appear at subsequent court hearings. After hearing Vidljinovic's testimony,[2] where he stated that he did not recover the bullet himself nor see Tricoci physically possess the bullet, the judge declared that "[t]here will be a finding of no probable cause. The case is over." Doc. 72-15 at 9–10. The judge did not offer any further legal reasoning or support for the ruling.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992). The party seeking summary judgment bears the initial burden of demonstrating that no genuine

---

[2] The transcript of the preliminary hearing misidentifies Vidljinovic as "Bidljinovic." Doc. 72-15 at 4:17.

dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). "A genuine issue of material fact exists when 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Brown v. Osmundson*, 38 F.4th 545, 549 (7th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

## ANALYSIS

### I. Illegal Search Claim

Tricoci claims that the Defendant Officers violated his Fourth Amendment right against unreasonable searches when they entered his room and seized the 9mm bullet that purportedly belonged to him. He also claims that each Defendant Officer is liable for failing to intervene to prevent this violation.

The Fourth Amendment protects individuals against "unreasonable searches and seizures." U.S. Const. amend. IV. "The touchstone of Fourth Amendment inquiry is

reasonableness, a standard measured in light of the totality of the circumstances and determined by balancing the degree to which a challenged action intrudes on an individual's privacy and the degree to which the action promotes a legitimate government interest." *Green v. Butler*, 420 F.3d 689, 694 (7th Cir. 2005) (footnote omitted). "An administrative inspection, as a search, must comport with the Fourth Amendment's requirement of reasonableness, and therefore must be supported by either an administrative search warrant or valid consent." *Rutledge v. City of Chicago*, 652 F. App'x 466, 467 (7th Cir. 2016) (citation omitted). "The . . . warrant requirement[ ] of the Fourth Amendment [is] not applicable where a party consents to a search, where a third party with common control over the searched premises consents, or where an individual with apparent authority to consent does so." *Dakhlallah v. Zima*, 42 F. Supp. 3d 901, 913 (N.D. Ill. 2014) (citations omitted). Although courts presume warrantless searches to be unreasonable, "[i]n a § 1983 case, once the defendant presents evidence that the plaintiff consented to the search, the burden shifts to the plaintiff to establish the lack of consent to search." *Wonsey v. City of Chicago*, 940 F.3d 394, 399 (7th Cir. 2019).

Defendants raise three arguments in support of their motion for summary judgment on Tricoci's unlawful search claim: first, that the Defendant Officers had a warrant, next, that they had consent, and, failing those, that they enjoy qualified immunity. The Court addresses each argument in turn.

First, Defendants argue that the Defendant Officers' search was lawful because the Department of Buildings had a court order to inspect the property, and the Department of Buildings' inspectors requested the presence of the Defendant Officers to ensure the premises were safe. But Defendants did not include the state court's inspection order as part of the evidentiary record, something that Tricoci notes in his responsive briefing. Indeed, Hopkins

7

commented during her interview with the Civilian Office of Police Accountability that "it looks like maybe there wasn't an actual order made from court for the inspection, but the court inspection was, in fact, set for the 23rd of April at 9:30 a.m." Doc. 72-8 at 22:11–14. Without documentary evidence showing that the Department of Buildings or Defendant Officers possessed a warrant or had other authority to search the premises, the Court cannot credit the Defendant Officers' mere say-so that a court authorized their search of 1444 West Winona. *See Celotex*, 477 U.S. at 323 (moving party bears the burden of producing evidence in support of summary judgment). Accordingly, the Defendant Officers cannot rely on the purported court order as a basis for summary judgment.[3]

The Defendant Officers' second argument is that the building's owner consented to their entry into 1444 West Winona and that Tricoci's actions gave them a reasonable belief that he consented to McCrudden and Barker's search of his room. Ample undisputed evidence supports their contention that they had authority to enter the building based on the owner's consent, including Tricoci's testimony that the owner "of course" agreed to the inspection and "told [him] that there [would be] a walk-through. That the City need[ed] to come through." Doc. 72-3 at 138:20–22. Accordingly, a reasonable jury must conclude that the Defendant Officers had authority to enter 1444 West Winona at least based on the owner's consent. *See United States v. Basinski*, 226 F.3d 829, 834 (7th Cir. 2000) ("The key to consent is actual or apparent authority over the area to be searched.").

But this does not automatically mean that the Defendant Officers had consent to search Tricoci's room, as the owner's consent cannot be implied to her tenants without a showing of

---

[3] The Court notes that it does not believe that the Defendant Officers are being dishonest by representing that a warrant or court order existed. However, mere representations do not suffice as competent evidence for summary judgment.

common authority over Tricoci's room. *See Montgomery v. Vill. of Posen*, No. 14 C 3864, 2015 WL 6445456, at *2–3 (N.D. Ill. Oct. 23, 2015) ("Barr's status as Montgomery's landlord does not by itself establish that the consent was valid, because '[a] landlord does not have authority to permit a search of his tenant's leasehold[.]'" (alteration in original) (quoting *United States v. Chaidez*, 919 F.2d 1193, 1201 (7th Cir. 1990))). Therefore, the Court turns to whether Tricoci manifested his implicit consent to McCrudden and Barker's search of his room. The Defendant Officers focus on the fact that Tricoci testified that he left his door open and did not attempt to prevent them from entering his room even after becoming aware of police officers inside the building. Tricoci contends that the Defendant Officers never approached him to obtain consent, and that in its absence, McCrudden and Barker did not have a license to walk into a room merely because its occupant left the door ajar.

In the Seventh Circuit, "[t]he scope of consent is limited by the breadth of actual consent, and whether the search remained within the boundaries of the consent is a question of fact to be determined from the totality of all the circumstances." *United States v. Jackson*, 598 F.3d 340, 348 (7th Cir. 2010) (citation omitted) (internal quotation marks omitted). "The standard for measuring the scope of consent under the Fourth Amendment is one of objective reasonableness and asks what the typical reasonable person would have understood by the exchange between the law enforcement agent and the person who gives consent." *Id.* That this standard requires an "exchange between the law enforcement agent and the person who gives consent" suggests that Tricoci must have interacted with McCrudden and Barker in a way that manifested consent to search. *Id.* Although Tricoci could have consented through some sort of non-verbal action, *see United States v. Walls*, 225 F.3d 858, 863 (7th Cir. 2000) ("[C]onsent may be manifested in a non-verbal as well as verbal manner[.]"), the record does not reflect any interaction between

9

Tricoci or McCrudden and Barker that could have manifested consent to their search—silent or otherwise. Instead, the only interaction Tricoci had with these officers prior to the search involved him giving Barker some basic identification information and indicating that he lived upstairs. Moreover, the body camera footage indicates that Tricoci's door was actually closed at the time the first Defendant Officers and other City employees entered the second floor. Accordingly, the Court finds at least a disputed fact exists as to whether Tricoci consented to the search of his room.

This brings the Court to Defendants' third argument: qualified immunity. Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted) (internal quotation marks omitted). "Although qualified immunity is an affirmative defense, [Tricoci] has the burden of defeating it once the defendants raise it. To do so, [Tricoci] must show (1) that the defendant violated a constitutional right, when construing the facts in the light most favorable to [Tricoci], and (2) that the right was clearly established at the time of the alleged violation, such that it would have been clear to a reasonable actor that [his] conduct was unlawful." *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017). "[T]he clearly established right must be defined with specificity." *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019). Tricoci can show a clearly established right by (1) "point[ing] to a clearly analogous case establishing the right to be free from the conduct at issue" or (2) "show[ing] that the conduct was 'so egregious that no reasonable person could have believed that it would not violate clearly established rights.'" *Beaman v. Freesmeyer*, 776 F.3d 500, 508 (7th Cir. 2015) (quoting *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001)).

10

Although the record does not include a warrant or order issuing from any court, every individual working on behalf of the City appears to have acted as if a warrant existed. The Department of Buildings inspectors appeared to search 1444 West Winona as if they had a warrant or court order. The inspectors similarly acted as if they had authority to enter the building when they requested help from the Defendant Officers to provide lighting and safety during the inspection due to the heightened risk of violence at the property. McCrudden's and Barker's respective deposition testimony clearly indicates that they believed that a lawful basis existed for them to enter the building. *See* Doc. 72-2 at 200:11–12 (Barker's testimony that he believed "[t]here was a court order signed by a judge" to inspect the property); Doc. 72-7 at 39:24–43:19 (McCrudden discussing the reasons for police presence and noting that "the city inspectors had agreed with the property owner to do an inspection on that day"). Moreover, Defendants point to Tricoci's own testimony where he said that he knew an inspection would occur and that city officials would need access to his bedroom. *See* Doc. 72-3 at 138:20–139:13 (explaining that he knew "the City need[ed] to come through" and that he "wasn't surprised" to see police present despite not knowing they would accompany the City inspectors). Under such circumstances, Defendants argue that the Defendant Officers are entitled to qualified immunity due to their good faith belief that they had a lawful basis to enter Tricoci's room. *See Chelios v. Heavener*, 520 F.3d 678, 690–91 (7th Cir. 2008) (qualified immunity protects officers who believe they act in good faith). Defendants further argue that Tricoci cannot point to caselaw establishing that police officers violate a person's Fourth Amendment rights when they enter a person's dwelling to provide protection for building inspectors under the good faith belief that the inspectors have a lawful basis for conducting the inspection. *See City of Escondido*, 586 U.S. at 42 ("[T]he clearly established right must be defined with specificity.").

11

Tricoci does not seriously attempt to martial caselaw in his favor establishing that police officers violate the Fourth Amendment when they conduct a warrantless search despite having a good faith belief that a warrant or court order exists. Instead, he argues that the existence of factual disputes concerning the legitimacy of the bullet McCrudden and Barker found in his room plus McCrudden's statement that the Defendant Officers could "clear his house arrest" combine to void any qualified immunity that the Defendant Officers would otherwise receive. But aside from a citation to a case where the disputed facts were directly relevant to the Court's qualified immunity analysis, Tricoci does not explain how the resolution of the disputed purported facts in his favor in this case would show that the Defendant Officers violated a clearly established right with respect to the Defendant Officers' entry into his room. Absent such explanation, the Court cannot credit his argument, particularly where nothing in the record calls into question that the Defendant Officers understood that their presence stemmed from a court-ordered inspection of the property. *See Wonsey*, 940 F.3d at 401 (qualified immunity protected officers from illegal search and seizure claim where the officers entered the plaintiff's house at the request of building inspectors, who had authority to be present on the property); *Dunn v. City of Elgin*, 347 F.3d 641, 650–51 (7th Cir. 2003) ("Because Plaintiffs have not shown that it was clearly established by February 2000 that seizing a child pursuant to an out-of-state order [in violation of a state statute] could constitute a violation of the Fourth Amendment, the officers are entitled to qualified immunity on that claim.").

Accordingly, the Court finds that qualified immunity shields the Defendant Officers from Tricoci's illegal search claim. And because the Court finds for the Defendant Officers on Tricoci's substantive illegal search claim, it also grants them summary judgment on Tricoci's failure to intervene claim that derived from this alleged constitutional violation. *See Harper v.*

*Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) ("In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation[.]").

**II.  False Arrest Claim**

Tricoci also claims that the Defendant Officers violated his Fourth Amendment right against false arrest when Bazar took him into custody for violating 720 Ill. Comp. Stat. 5.0/24-1.1(a), which makes it unlawful for a felon to possess a firearm, including ammunition.  He also claims that each Defendant Officer is liable for failing to intervene against their co-Defendants' violations of this substantive right.

"To prevail on a Fourth Amendment false-arrest claim, 'a plaintiff must show that there was no probable cause for his arrest.'" *Braun v. Vill. of Palatine*, 56 F.4th 542, 548 (7th Cir. 2022) (quoting *Neita v. City of Chicago*, 830 F.3d 494, 497 (7th Cir. 2016)).  "The existence of probable cause to arrest is an absolute defense to any § 1983 claim against a police officer for false arrest[.]"  *Jump v. Vill. of Shorewood*, 42 F.4th 782, 788 (7th Cir. 2022) (citation omitted).

Probable cause exists "when the facts and circumstances that are known to [the officer] reasonably support a belief that the individual has committed, is committing, or is about to commit a crime." *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007).  This is a "common-sense inquiry requiring only a probability of criminal activity"; probable cause exists "whenever an officer . . . has enough information to warrant a prudent person to believe criminal conduct has occurred." *Leaver v. Shortess*, 844 F.3d 665, 669 (7th Cir. 2016) (citation omitted). Because Bazar arrested Tricoci for being a felon in possession of ammunition, and the undisputed facts show that the Defendant Officers knew of Tricoci's felon status, the Court's

13

inquiry focuses solely on whether probable cause existed to impute possession of the bullet to Tricoci.[4]

Tricoci argues that no probable cause could have existed for his arrest. He maintains that "it is disputed that [Officers McCrudden and Barker] recovered a live round of ammunition." Doc. 80 at 7. He also claims that even if Officers McCrudden and Barker recovered a real bullet, it is because Officer McCrudden planted the bullet in his room. Tricoci lastly asserts that even if Officers McCrudden and Barker did find a real bullet and Officer McCrudden did not plant it, then Defendants' argument that Tricoci constructively possessed the ammunition shows that they lacked evidence that it belonged to him, meaning they had no probable cause to arrest him.

The Court can quickly discard Tricoci's claim of a dispute over whether McCrudden and Barker recovered a real bullet from his room, as he has pointed to no evidence that would suggest that the object seen on Barker's body camera is not a bullet. *See* Ex. 11 at 34:15–25; *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("[Plaintiff]'s version of events is so utterly discredited

---

[4] Although the Circuit Court of Cook County previously entered a finding that probable cause did not exist for Tricoci's arrest, the Court does not bestow that judgment with preclusive effect. First, Tricoci did not argue that collateral estoppel should apply, meaning he waived this argument. *Cf. Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."). Moreover, such an argument would fail on the merits. For collateral estoppel to apply, Tricoci must show "(1) the previously-decided issue is identical to the one currently presented, (2) a final judgment was issued on the merits in the prior adjudication, and (3) the party against whom collateral estoppel is argued was either a party in, or in privity with another party in, the earlier proceeding." *Posey v. Pruger*, No. 10 C 3574, 2015 WL 5610764, at *3 (N.D. Ill. Sept. 22, 2015) (citing *Gumma v. White*, 216 Ill. 2d 23, 38 (2005)). Although Tricoci might succeed on the first two prongs of this analysis, he would fail on the third because the Defendant Officers "were not parties to the state court proceedings and did not have a full and fair opportunity to litigate the issue of whether they had probable cause to arrest [Tricoci.]" *Booker v. Ward*, 94 F.3d 1052, 1057 (7th Cir. 1996); *see also Torres v. City of Chicago*, No. 18 C 2603, 2021 WL 392703, at *9 (N.D. Ill. Feb. 4, 2021) (refusing to give collateral estoppel effect to state court finding that officers lacked consent to search apartment because the officers "were not in privity with the prosecution because they were not 'so closely aligned that they represent the same legal interest'" (citation omitted)). The Court would also deny preclusion on equitable grounds given the absence of any explanation for the state court's probable cause decision. *Cf. Posey*, 2015 WL 5610764, at *6 (denying preclusive effect to a state court's finding of no probable cause where "[a]ll parties agree that Judge Jones ruled on the issue. But his reasons for doing so remain unclear").

by the [video evidence] that no reasonable jury could have believed him."). And even indulging Tricoci's version of events that the object Barker held was a highly accurate facsimile of a bullet, that would not change the Court's analysis. Tricoci has not presented, nor has the Court discovered, caselaw that would have required Barker to possess complete certainty that the object he was holding was a live round versus a dead replica. Given that probable cause rests on a "common-sense inquiry," *Shortess*, 844 F.3d at 669, the object that Barker held sufficiently resembles a live round of ammunition for the Court to credit Barker's belief that it was a bullet without conducting any forensic testing.

But the Court nonetheless agrees with Tricoci that a question of fact exists as to whether McCrudden or Barker planted the bullet in his room, which would negate a finding of probable cause. The body camera footage does not conclusively refute Tricoci's testimony that he did not have any ammunition in his room, and so the Court cannot rely solely on the footage in determining whether a dispute of fact exists. *See Kailin v. Vill. of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023) ("Video evidence . . . can eviscerate a factual dispute only when the video is so definitive that there could be no reasonable disagreement about what the video depicts."). A reasonable jury could take Tricoci's testimony, the metallic sound caught on camera as McCrudden first leaves Tricoci's room, the nonchalant manner in which McCrudden points out the bullet lodged in the corner after Barker had apparently already looked there, and McCrudden and Barker's comments during the search that focused on finding a basis to arrest Tricoci as evidence that McCrudden and Barker framed Tricoci. Therefore, a dispute of fact exists as to whether probable cause existed to arrest Tricoci.

That said, the evidence only supports allowing Tricoci's false arrest claim to go forward against McCrudden and Barker, the only Defendant Officers who entered Tricoci's room. *See*

*Pepper v. Vill. of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005) ("[T]o be liable under § 1983, the individual defendant must have 'caused or participated in a constitutional deprivation.'" (quoting *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1248 (7th Cir. 1994))). Although Bazar arrested Tricoci, he did so on McCrudden and Barker's orders after Barker handed him the bullet found in Tricoci's room. And the record does not include any evidence that would suggest that Bazar conspired with McCrudden and Barker to plant the bullet in Tricoci's room. Therefore, Bazar had at least arguable probable cause to effectuate Tricoci's arrest, meaning qualified immunity protects Bazar with respect to the false arrest claim. *See McComas v. Brickley*, 673 F.3d 722, 725 (7th Cir. 2012) ("In the context of a wrongful arrest, the question turns on whether the arresting officer had 'arguable probable cause.' Arguable probable cause exists when a reasonable officer could *mistakenly* have believed that he had probable cause to make the arrest." (citation omitted)). And because Tricoci makes no argument and presents no evidence to tie the remaining Defendant Officers to his arrest or to suggest that they could have intervened in preventing McCrudden or Barker's actions, with some of these Defendant Officers arriving on the scene after the arrest occurred, the Court grants summary judgment to the remaining Defendant Officers as well. *See Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017) (to prevail on a failure to intervene claim, the plaintiff must show that the defendants "(1) knew that a constitutional violation was committed; and (2) had a realistic opportunity to prevent it").

      In summary, the Court allows Tricoci's false arrest claim to proceed against McCrudden and Barker but enters judgment for the remaining Defendant Officers on Tricoci's false arrest claim and his failure to intervene claim related to his arrest.

### III. State Law Malicious Prosecution Claim

Tricoci's last claim against the Defendant Officers is that they maliciously prosecuted him in violation of Illinois state law. "To establish a claim for malicious prosecution under Illinois law, plaintiffs must establish five elements: (1) commencement or continuation of an original proceeding; (2) termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause; (4) malice; and (5) damages." *Cairel v. Alderden*, 821 F.3d 823, 834 (7th Cir. 2016) (citing *Sang Ken Kim v. City of Chicago*, 368 Ill. App. 3d 648, 654 (2006)). "The failure to establish any one element bars recovery." *Id.* (citing *Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635, 641 (2002)).

For purposes of a malicious prosecution claim, probable cause exists where the facts "would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *Williams v. City of Chicago*, 733 F.3d 749, 759 (7th Cir. 2013) (citation omitted). "For purposes of a malicious prosecution claim, the pertinent time for making the probable cause determination is the time when the charging document is filed, rather than the time of the arrest." *Holland v. City of Chicago*, 643 F.3d 248, 254 (7th Cir. 2011).

The Court has already found a question of fact exists with respect to probable cause as to McCrudden and Barker at the time of Tricoci's arrest. Because nothing changed between then and the time when a criminal complaint was filed, the Court similarly finds a question of fact as to the existence of probable cause for purposes of Tricoci's malicious prosecution claim against McCrudden and Barker. *See Wilson v. Est. of Burge*, 667 F. Supp. 3d 785, 873 (N.D. Ill. 2023) (a defendant cannot manufacture probable cause by fabricating evidence). Similarly, a reasonable jury could infer malice as to these two officers, given the questions as to whether

17

probable cause existed and inferences that a jury could draw from McCrudden and Barker's comments about Tricoci on the body camera footage, particularly about wanting to clear Tricoci's house arrest. *See Beaman v. Freesmeyer*, 2021 IL 125617, ¶ 141 ("Malice, as an element of malicious prosecution, has been defined as the initiation of a prosecution for an improper motive. An improper motive for a prosecution is any reason other than to bring the responsible party to justice." (citation omitted)); *Holland*, 643 F.3d at 255 ("[M]alice can be inferred when a defendant lacks probable cause and the circumstances indicate a lack of good faith."). Further, a reasonable jury could find that both McCrudden and Barker played a significant role in causing the prosecution so as to have commenced or continued it. *See Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 44 ("Liability thus depends on whether the defendant was actively instrumental in causing the prosecution, and the presumption of prosecutorial independence can be overcome by showing that the defendant improperly exerted pressure on the prosecutor, knowingly provided misinformation to him or her, concealed exculpatory evidence, or otherwise engaged in wrongful or bad-faith conduct instrumental in the initiation of the prosecution. Police officers may be subject to liability for malicious prosecution [i]f they initiate a criminal proceeding by presentation of false statements, or by withholding exculpatory information from the prosecutor." (alteration in original) (citations omitted) (internal quotation marks omitted)); *see also Serrano v. Guevara*, No. 17 CV 2869, 2020 WL 3000284, at *20 (N.D. Ill. 2020) (police officers "played a 'significant role' in the commencement of plaintiffs' criminal prosecution" where they "knowingly presented false information to and withheld exculpatory evidence from the felony review and grand jury attorneys who initiated the legal proceedings"). Therefore, the Court allows Tricoci's malicious prosecution claim to proceed against McCrudden and Barker.

But Tricoci's malicious prosecution claim cannot proceed against the remaining Defendant Officers. The record does not suggest that any of the other Defendant Officers, aside from Vidljinovic, played any role in his prosecution, which Tricoci appears to concede in his response. *See Beamon*, 2019 IL 122654, ¶ 45 (to be liable for malicious prosecution, police officers must have played a "significant role" in the prosecution). With respect to Vidljinovic, the evidence of record would not allow a reasonable jury to infer that he knew of any fabrication of evidence or acted with malice in completing the arrest report or testifying at the preliminary hearing. *See Ruiz-Cortez v. City of Chicago*, No. 11 C 1420, 2016 WL 6270768, at *19–20 (N.D. Ill. Oct. 26, 2016) (where no evidence existed to dispute that the officer based the arrest on information that he heard from another officer, even where the plaintiff disputed the veracity of that information, the officer could not be held liable for malicious prosecution). Therefore, the Court enters summary judgment for all Defendant Officers but McCrudden and Barker on Tricoci's malicious prosecution claim.

## IV. Indemnification and *Respondeat Superior* Claims

Finally, because the Court allows Tricoci's false arrest and malicious prosecution claims to proceed against McCrudden and Barker, his indemnification and *respondeat superior* claims against the City must proceed as well.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion for summary judgment [70]. The Court enters summary judgment for Vidljinovic, Ghorbanian, Maldonado, Marzen, Leach, Jacob, Bazar, and Burke on all of Tricoci's claims against them. The Court also enters summary judgment for Barker and McCrudden on Tricoci's illegal search claims. Tricoci's claims against Barker and McCrudden for false arrest and malicious

19

prosecution and his indemnification and *respondeat superior* claims against the City may proceed to trial.

Dated: March 13, 2025

                                                    SARA L. ELLIS
                                                    United States District Judge